IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FP AUGUSTA II, LLC, and             *
FREEDOM'S PATH LIMITED              *
PARTNERSHIP,                        *
                                    *
     Plaintiffs,                    *
                                    *
          v.                        *          CV 119-048
                                    *
CORE CONSTRUCTION SERVICES,         *
LLC,                                *
                                    *
     Defendant.                     *

_____

O R D E R
_____

Before the Court is Plaintiffs FP Augusta II, LLC ("FP") and
Freedom's Path Limited Partnership's ("Freedom's Path") motion for
partial summary judgment on Defendant Core Construction Services,
LLC's ("Core") counterclaim.   (Doc. 102.)   For the following
reasons, Plaintiffs' motion is **GRANTED IN PART** and **DENIED IN PART.**

## I. BACKGROUND

This case is a contract dispute between the above-named
entities: Plaintiffs - two organizations that own historic
buildings at the Charlie Norwood Veterans Administration Campus in
Augusta, Georgia - and Defendant, the general contractor tasked
with renovating those buildings (the "Project").   The Project was
governed by two separate contracts (the "Contracts"), identical in

form and substance except as they delineate the distinct contract sums and ownership of the buildings by each Plaintiff.[1]

The Parties' relationship was troubled from the outset. After signing the Contracts on June 6, 2016 (Doc. 106-1, 70:17-19), the Project faced an immediate three-month delay while Plaintiffs closed on their finances. (Id. at 70:20-71:3.) Once the project finally began, Core allegedly started to encounter unforeseen conditions and events related to the Project, culminating in over 100 Requests for Information ("RFI") directed to the Project's architect – a high number that he testified is "absolutely" unusual. (Doc. 116-2, 54:8-12.) Core alleges it also submitted at least 48 Proposed Change Orders ("PCO"), generally requesting additions to the contract sum and/or time to account for the adjustments it made to address those unforeseen conditions and events. (Doc. 115, at 4.) Responses to these RFIs and PCOs from the architect and Plaintiffs were varied and, in some cases, contentious; now, due to their importance under the Contracts as explained below, these documents are at the center of the Parties' claims against each other. Ultimately, substantial completion was declared for Building 7 on February 12, 2018, which Plaintiffs allege was 67 days after the contractual completion date of December 8, 2017; for Building 18 on April 24, 2018, which

---

[1] Plaintiff FP owns Building 7 while Plaintiff Freedom's Path owns Buildings 18 and 76.

Plaintiffs allege was 112 days after the contractual completion date of January 3, 2018; and for Building 76 on June 8, 2018, which Plaintiffs allege was 112 days after the contractual completion date of February 16, 2018. (Doc. 1-1, ¶ 12.) For these delays and for numerous other alleged breaches of contract including unfinished or deficient work, Plaintiffs assert claims against Core for damages, costs, interest, and litigation expenses. (Id. at 9-12.)

The present motion, however, does not involve Plaintiffs' claims. Rather, Plaintiffs seek partial summary judgment on Core's counterclaim, which alleges eight different counts against Plaintiffs: Counts I and II for breach of contract; Counts III and IV for unjust enrichment; Counts V and VI for breach of the implied covenant of good faith and fair dealing; and Counts VII and VIII for expenses of litigation. (Answer, Affirm. Defenses, Countercl., Doc. 7, at 11-21.) Plaintiffs previously moved to dismiss Counts III and IV of the counterclaim on April 26, 2019, which the Court denied in its December 10, 2019 Order. (Docs. 21, 60.) Now, based on two theories, Plaintiffs seek summary judgment on several of these counts. First, Plaintiffs allege Core has waived its right to recover for several of its claims under the breach theories due to various contractual notice and waiver provisions. (Doc. 102, at 1-2.) Second, Plaintiffs allege Core's unjust enrichment claims fail because unjust enrichment claims are improper where, as

3

Plaintiffs allege here, an express contract governs the contested claim.  (Id. at 2.)

On April 1, 2021, the Clerk of Court provided all parties notice of Plaintiffs' motion for partial summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default.  (Doc. 107.)  For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), have been satisfied.  The time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration.  The Court's findings are below.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A "material" fact is one that could "affect the outcome of the suit under the governing [substantive] law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), while a dispute is genuine "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001).  Any inferences drawn from the facts must be in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986), and the Court is to "resolve all reasonable doubts about the facts in favor of the non-movant." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation, internal quotation marks, and internal punctuation omitted). The Court may not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court the basis for its motion by reference to materials in the record. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant may carry its initial burden in different ways depending on who bears the burden of proof at trial. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the nonmovant bears the burden of proof at trial, as Defendant does here on its counterclaim, the movant has two options as to how it can carry its initial burden. Id. at 1115-16. The movant may demonstrate an absence of evidence to support the nonmovant's case, or provide affirmative evidence demonstrating the nonmovant's inability to prove its case at trial. Id. The nonmovant must then respond according to the manner used by the movant. The nonmovant must respond with "evidence sufficient to withstand a directed verdict" when the movant provided affirmative evidence. Id. When the movant demonstrates an absence of evidence, the nonmovant may either identify evidence in the record sufficient to withstand a directed verdict, or the nonmovant may come forward with additional

evidence sufficient to withstand a directed verdict. <u>Id.</u> at 1116-17.

Additionally, the Southern District of Georgia's Local Rules require:

> [I]n addition to the brief, there shall be annexed to the motion a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law thereof.  Each statement of material fact shall be supported by a citation to the record. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party.

L.R. 56.1, SDGa.  "Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions." <u>Preis v. Lexington Ins. Co.</u>, 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007).  Essentially, the Court has no duty "to distill every potential argument that could be made based upon the materials before it on summary judgment." <u>Id.</u> (citing <u>Resol. Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995)).  Accordingly, the Court will only review materials the Parties specifically cited and legal arguments they expressly advanced.  <u>See id.</u>

### III. ANALYSIS

As described above, Defendant's counterclaim is divided into four groups, with each group consisting of two claims – one against each Plaintiff. Plaintiffs, however, seek summary judgment on only those claims relating to (1) PCOs; (2) claims for time extensions; (3) claims for delay damages; and (4) claims for unjust enrichment. (Doc. 102, at 1.) Plaintiffs' legal contentions as to the first three of these claims relate to various waiver and notice provisions within the Contracts. The Court will address each type of claim in turn.

#### A. Claims Relating to Proposed Change Orders

In its counterclaim, Core asserts breach of contract related to outstanding PCOs. More specifically, Core alleges Plaintiff FP owes it $114,901.00 for its failure and refusal to execute six PCOs (PCOs 071009-14) and Plaintiff Freedom's Path owes it $509,904.00 for its failure and refusal to execute twenty-one PCOs (PCOs 181010-19 and PCOs 761009-19). (Doc. 7, at 11, 13.) Plaintiffs seek summary judgment on these contract claims, arguing that Core failed to make its claims for the disputed amounts within 21 days of recognizing the condition giving rise to each claim as required by § 4.3 of the Contracts and that such failure dooms Core's claims. (Doc. 102, at 13.) Specifically, Plaintiffs argue that Core's contractual claims for additional sums and/or time (which it defines as synonymous with Core's submitted PCOs) were

untimely under that notice provision, and in the alternative, that all of Core's other, timely written notices related to each claim were inadequate to constitute contractual claims.  (Doc. 120, at 4-11.)  The contractual provisions at issue provide:

> § 4.3.1 Definition.  A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract.  The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract on only those disputes which arose prior to the date final payment is due.  Claims must be initiated by written notice.  The responsibility to substantiate Claims shall rest with the party making the Claim.
>
> § 4.3.2 Time Limit on Claims.  Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later.  Claims must be initiated by written notice to the Architect and the other party.  Any claim(s) not initiated within the time limits set forth herein are waived.

(Contracts § 4.3.1, Doc. 7-1, at 34.)  Core argues that the written notices it provided were both timely and sufficient to initiate contractual claims - or at least that a jury question exists regarding the same - and that summary judgment is therefore inappropriate.  (Doc. 115, at 8-14.)

To determine whether Core's claims are barred under the Contracts, the Court must construe the Contracts.  Chemence Med. Prods., Inc. v. Medline Indus., Inc., 119 F. Supp. 3d 1376, 1380

(N.D. Ga. 2015).   In Georgia, the construction of a contract "is a question of law for the court." Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co., 707 S.E.2d 369, 371 (Ga. 2011) (citation omitted).

> If a contract is unambiguous, courts enforce it as written.  When a court finds an ambiguity, however, it must attempt to resolve that ambiguity using the rules of construction.  The contract is considered as a whole and should be interpreted so that its parts all harmonize. Courts should give reasonable, lawful, and effective meaning to the provisions of the contract, avoiding unreasonable interpretations.

Chemence, 119 F. Supp. 3d at 1380.

At issue here is whether, when taken in the light most favorable to Core and resolving all reasonable doubts in Core's favor, a reasonable factfinder could conclude that any timely communications between Core and Plaintiffs initiated a contractual claim.   The Court may not weigh the evidence or determine credibility.   Anderson, 477 U.S. at 255.   The Court will address PCOs 071010-14 and PCOs 181010-19 and 761009-19 in turn.[2]

1. PCOs 071010-14

First, the Court will analyze Plaintiffs' request for summary judgment under § 4.3 of Core's contract with FP, related to PCOs 071010-14.   (Doc. 102, at 11-13.)

---

[2] Plaintiffs do not contest that PCO 071009 constituted timely and sufficient notice of Core's claim related thereto and accordingly do not seek summary judgment for PCO 071009 on the grounds of waiver under § 4.3 of the contracts.

Plaintiffs argue that Core's PCOs were the first (or only) written notice of Core's claims. (Id.) Indeed, Plaintiffs' initial argument implies that Core's PCOs *were* Core's claims under the Contracts ("[t]he record establishes that each and every one of the disputed PCOs . . . were untimely as they failed to comply with the 21[-]day timeline of asserting claims;" "[t]he date of the Claims, which are clearly established from the PCOs . . ."). (Id. at 13.) Core, however, points out that while § 4.3.2 requires that "notice be written and provided to both the Architect and the Owners," that provision "is otherwise silent as to the form of the notice and does not require the claimant to use of [sic] a specific document, such as an RFI, email or PCO, to satisfy the written notice requirement." (Doc. 115 at 8.) Core asserts that even though its PCOs were not submitted within 21 days of observing the condition giving rise to each claim, Core *did* timely submit at least one other form of written notice for each claim, such as a RFI and/or written correspondence, that it asserts was sufficient to initiate each claim. (Id. at 14.) Plaintiffs counterargue that none of the other forms of documentation were sufficient to initiate a claim under the Contracts and Core's claims are thus waived. (Doc. 120, at 4.)

After analyzing the evidence related to each PCO in the light most favorable to Core and drawing all reasonable inferences in Core's favor, the Court finds that a genuine dispute of material

fact exists regarding whether Core satisfied its § 4.3 obligations for each of its claims related to PCOs 071010-074014.

> As noted above,

> A Claim is a *demand or assertion* by one of the parties *seeking*, as a matter of right, *adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract* on only those disputes which arose prior to the date final payment is due.

(Contracts, at § 4.3.1) (emphasis added).  Regarding PCO 071010, Plaintiffs allege Core first observed the condition giving rise to the claim on July 27, 2017 but submitted its claim 84 days later on October 19, 2017.  (Doc. 102, at 11.)  To demonstrate Core's observance of the condition (which initiates the 21-day period to submit a claim), Plaintiffs point to a subcontractor invoice dated July 27, 2017 as evidence that Core first observed the condition giving rise to the claim on that date.  (Doc. 105-2, at 5.) Plaintiffs then aver Core failed to assert its claim until October 19, 2017, when Core submitted its PCO.  (Doc. 108, ¶ 19.)  However, the evidence shows that Core forwarded the subcontractor invoice to Plaintiffs and requested payment the same day it received the invoice - July 27, 2017.  (Doc. 105-8, at 11-12.)  Further, the evidence shows Core re-sent the same email to Plaintiffs on August 4, 2017, and that Plaintiffs responded on August 7, 2017 requesting

that Core "please proceed with paying the required fee until we can process the paper work [sic] and any related reimbursement." (Id.)

Contrary to Plaintiffs' assertions, a reasonable jury could determine - based on the contents of this email - that Core made "a demand or assertion . . . seeking . . . payment . . . with respect to the terms of the Contract" on the date Plaintiffs admit was the "date first observed." (Contracts, at § 4.3.1.)  And Core's claim is only waived if it failed to make such a demand or assertion within 21 days of that date.   (Contracts, at § 4.3.1.) Accordingly, a jury question exists as to whether Core's claim was waived under § 4.3, and summary judgment is inappropriate for PCO 071010.

So too is summary judgment inappropriate for PCOs 071011-14. While the timely claim-initiating written communications for these PCOs do not request payment as explicitly as the communications related to PCO 071010, the evidence related to each PCO could still allow a reasonable jury to find that Core made claims sufficient to prevent waiver under § 4.3.  Regarding PCO 071011, Plaintiffs admit that RFI 52, which Core sent contemporaneously with its first observance of the condition, provided: "[A] wall mounted strobe light must be installed [in hearing-impaired units]. These are not shown in the drawings or specs. Please provide additional information on the doorbell systems." (Doc. 105-4, at 4.)  Core

indicated "YES" in a section designating whether the RFI would create a "Cost Impact." (Id.)

RFI 69, which directly relates to PCO 071012, is a request from Core noting: "[T]here have been discrepancies between the code requirements and historical requirements for the handrails. Please provide a detail noting the locations of the handrails, attachment points and balusters (if required)." (Doc. 105-5, at 7.) While this may not reasonably constitute an assertion for payment, a reasonable juror could find it to be "relief with respect to the terms of the Contract" or a "dispute[] and matter[] in question between the Owner and Contractor arising out of or relating to the Contract." (Contracts, at § 4.3.1.) Accordingly, the timely correspondence between Core and Plaintiffs is sufficient to create a jury question regarding whether Core sufficiently made an "assertion" seeking "adjustment or interpretation of Contract Terms." (Contracts, at § 4.3.1.)

The facts underlying PCO 071013 are somewhat more complicated but lead the Court to the same result. Regarding notice of the condition giving rise to PCO 071013, Plaintiffs point to an email from their representative to Core on November 6, 2017 purportedly discussing the condition giving rise to the claim. (Doc. 105-6, at 1.) Core appears to accept this email as the date Core first observed the condition. (Doc. 115, at 11.) Core also claims this email was its notice to Plaintiffs of its claim. (Id.) However,

under § 4.3.1, "[t]he responsibility to substantiate Claims shall rest with the party making the Claim." (Contracts, at § 4.3.1.) Thus, Core had to make its claim, not Plaintiffs, and Core points to no evidence that it submitted a claim to Plaintiffs until its PCO was submitted December 14, 2017. (Doc. 115, at 11.) Core does assert, however, that "PCO 071013 is the subject of Construction Change Directive ("CCD") 002," which was submitted to Core on December 13, 2017 and is governed by § 7 of the Contracts. (Doc. 117 ¶ 22; Doc. 105-6, at 2.) According to that provision, Core must advise the architect and Plaintiffs of its agreement or disagreement with the method or adjustment in contract sum or time "[u]pon receipt of a [CCD]." (Contracts, at § 7.3.4.) Accordingly, Core may have a claim to these sums based on its submission for payment – PCO 071013 – upon its receipt of the CCD.

Regarding PCO 071014, Plaintiffs assert Core first observed the condition on June 26, 2017, citing an email from a subcontractor to Core. (Doc. 108, ¶ 23 (citing Doc. 106-3, at 5)). However, this document appears to relate not to PCO 071014, but to PCO 071007. Next, Plaintiffs assert Core was at least aware of the condition on December 22, 2017. (Doc. 102, at 17.) Core, however, claims it gave notice of the claim underlying PCO 071014 to Plaintiffs via RFI 66 on July 27, 2017. (Doc. 117, ¶ 23 (citing Doc. 117-5)). While Plaintiffs allege the first claim notification date was the date of the PCO – February 5, 2018 – RFI 66 is replete

with proposed changes to the designs and notes "[t]his RFI is considered critical in nature because it could potential [sic] have both time and monetary implications. If further exploratory action is required, we would like to be directed by the owner and authorized to do so." (Doc. 117-5, at 4.) This language could reasonably be construed as seeking adjustment of contract terms or payment.

For these reasons, summary judgment is **DENIED** on Core's counterclaim as it relates to claims for additional contract sums under PCOs 071010-14.

2. PCOs 181010-19 and 761009-19

Next, the Court will analyze Plaintiffs' request for summary judgment under § 4.3 of the Second Contract – related to the PCOs of Plaintiff Freedom's Path, PCOs 181010-19 and 761009-19. (Doc. 102, at 11-13.) As detailed below, a genuine dispute of material fact exists regarding Core's requests for payment related to each claim under PCOs 181010-18, 076010-14, and 076017-19, but *not* for Core's request for payment under PCO 181019 and PCOs 076015-16. First, the Court will address the claims for which a genuine dispute of material fact exists and specify the evidence giving rise to that dispute. Second, the Court will address the claims for which no genuine dispute of material fact exists and address the Parties' arguments related thereto.

As an initial matter, the timeliness and language of Core's notice to Plaintiffs regarding PCOs 181010, 181012, 181016, 181018, 761010, 761011, 761013, and 761017 is substantially similar, if not identical, to PCOs discussed in the preceding section.[3]  For the reasons explained above, a genuine dispute of material fact exists regarding the claims under those PCOs and summary judgment is inappropriate.  The same exists for the disputes listed below:

- For PCO 181011, Plaintiffs assert Core first observed the condition giving rise to the claim on May 8, 2017. (Doc. 108, ¶ 25.)  The RFI submitted on that day, RFI 53, states, "Core is in need of a revised [e]lectrical plan for buildings 18 & 76 showing the locations of outlets and switches for the kitchen sink disposals. Please provide revised drawings so this work can be priced accordingly."  (Doc. 105-9, at 4.)

- For PCOs 181013 and 181015, Plaintiffs assert Core first observed the conditions giving rise to the claims on June 19, 2017.  (Doc. 108, ¶¶ 27, 29.)  The RFI submitted on that day, RFI 59, explains issues allegedly not contemplated under the original contract before

---

[3] Specifically, the following groups of PCOs are so closely related that the analysis for each is the same: PCOs 181010, 071010, and 076011; PCOs 181012, 071011, and 761010; and PCOs 181016, 181018, 071013, 761013, and 761017.

requesting that the architect "[p]lease provide a detailed system that will bring these [walls/beams] up to code." (Doc. 105-11, at 12.)

- For PCOs 181014 and 181017, Plaintiffs assert Core first observed the conditions giving rise to the claims on October 2, 2017. (Doc. 108, ¶¶ 26, 31.) The RFI submitted on that day, RFI 84, states: "[W]e cannot lower the storm sewer line because this would cause the connecting manholes to be lowered, and call for a larger retention pond, which will have substantial cost impact. The best action would be to offset the existing water line. Please advise with instructions on how to proceed." (Doc. 105-12, at 5.)

- For PCO 761009, Plaintiffs assert Core first observed the condition giving rise to the claim on May 18, 2017. (Doc. 108, ¶ 34.) The RFI submitted on that day, RFI 53, states: "[P]lease provide revised drawings so this work can be priced accordingly." (Doc. 105-18, at 5.)

- For PCO 761012, Plaintiffs assert Core first observed the condition giving rise to the claim on August 15, 2017. (Doc. 108, ¶ 37.) The RFI submitted on that day, RFI 70, states, "Please provide a detail noting the locations of the handrails, any curb requirements,

17

attachment points, mid-rails and balusters (if required)." (Doc. 105-5, at 10.)

- For PCOs 761014 and 761018, Plaintiffs assert Core had notice of the conditions giving rise to the claims beginning on June 1, 2017, pointing to a letter from Core noting "city engineers completed their review and stamped the drawings with a date of June 1st, 2017." (Doc. 108, ¶¶ 39, 43; Doc. 103-2.) Plaintiffs then assert the first contractual claim notification dates were February 9, 2018 (when Core submitted PCO 761014) and March 14, 2018 (when Core submitted PCO 761018). (Doc. 108, ¶¶ 39, 43; Doc. 105-21, at 1; Doc. 105-26, at 1.) Core disagrees with Plaintiffs' assertion of the dates it became aware of the conditions giving rise to the claims, arguing instead that the unforeseen conditions giving rise to these PCOS arose at different times after June 1, 2017. (Doc. 117, ¶ 39, 43.) For PCO 761014, Core states it "notified the Owner and Architect of [additional, related unforeseen conditions] immediately on or before November 8, 2017" (Doc. 116-1, ¶ 14) and claims an "[e]mail [not provided in evidence] from Cranston Engineering to Core, Owner, and Architect" on that date constituted its initial notice (Doc. 115, at 13). This raises a material dispute about whether

the initial drawings cited by Plaintiffs constituted notice of the condition giving rise to Core's claim under PCO 761014. For PCO 761018, Core claims its November 20, 2017 letter to Plaintiffs entitled "Request for Extension of Time and Additional Compensation" constituted initial notice of its claim. (Doc. 117, ¶ 43; Doc. 103-2.) Core asserts that after it sent this notice, Plaintiffs ordered additional revised drawings, which the civil engineer issued on December 1, 2017, upon which Core requested pricing for the work. (Doc. 116-1, ¶ 14.) Thus, for both PCOs, a reasonable jury could find that Core initiated its claims.

- For PCO 761019, Plaintiffs assert Core first observed the condition giving rise to the claim on November 27, 2017. (Doc. 108, ¶ 44.) The RFI submitted on that day, RFI 92, states: "the landing and sidewalk exiting the building will not work as shown . . . . Additional civil drawings are required to install the landing and connecting sidewalk. Please provide additional civil drawings detailing grade elevations, layout, drainage and any other factors that will allow for the install of the exterior landing and sidewalk at this location." (Doc. 105-26, at 5.)

On all these above-described claims, a genuine dispute of material fact exists about whether Core made its Claim, and summary judgment is inappropriate. For the claims described below, however – those related to PCOs 181019, 761015, and 761016 – because no genuine dispute of material fact exists, summary judgment is therefore appropriate.

For PCO 181019, Plaintiffs assert Core first observed the condition giving rise to the claim on November 15, 2017. (Doc. 108, ¶ 33.) Plaintiffs assert Core then made its contractual claim on February 5, 2018 – eighty-two days after it observed the condition. (Id.) Core "disputes Plaintiffs' assertion of 'Date First Observed'" (Doc. 115, at 12 n. 2, 3), but in its response to Plaintiffs' SUMF, it claims "[Plaintiffs] received written notice of the claim on or before November 8, 2017 via e-mail correspondence between Cranston Engineering, Morton Gruber (Architect) and Core, thus initiating the claim as required by the contracts." (Doc. 117, ¶ 33.) Essentially, Core claims it had not just observed the condition giving rise to its claim by November 8, 2017, but that it submitted its contractual claim to Plaintiffs via emails on that date.

Core's arguments fail for two reasons. First, those emails simply fail to make a contractual claim. The emails come not from Core, but from a third-party engineer, and state the following: "[P]er discussions with Dennis regarding the sanitary sewer line,

duct bank, and water line obstacles we have revised storm line A. Please see attached for the plan and profile PDF's and review. Comments are appreciated." (Doc. 116-1, at 20.) Nothing in this language could reasonably constitute "a demand or assertion . . . seeking . . . adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract." (See Contracts, at § 4.3.1.) Nor could it be called a "dispute[] and matter[] in question between the Owner and Contractor." (See id.)

Second, even if Core had become aware of the condition on the later date - November 15, 2017 - as averred by Plaintiffs, Core has simply pointed to no evidence that could be reasonably interpreted as a contractual claim prior to its PCO on February 5, 2018. Under any combination of these facts, Core's contractual claim came more than 21 days after it admits it had notice of the condition. Thus, Core has waived its claim to recover for the contract sums related to PCO 181019. (See Contracts, at § 4.3.2.)

For PCOs 761015 and 761016, Plaintiffs assert Core must have observed the condition before November 1, 2017 because the photo it provides (and avers was taken on that date) "shows the vinyl tile installation complete, demonstrating the floor preparation had already been completed . . . [because] [t]he floor preparation is required to be completed prior to the vinyl tile installation." (Doc. 103-1, ¶ 6; Doc. 103-3.) Plaintiffs further allege Core

only gave notice of its claims on March 14, 2018, and January 16, 2018, respectively, pointing to the dates of Core's PCOs as evidence. (Docs. 105-22, 105-23.)  Core, in response, claims the photo shows only a "mock-up of the proposed repair" (Doc. 116-1 ¶ 16) and that it "notified [Plaintiffs] and [the] Architect immediately upon the discovery of the issue and engaged in discussions to determine the best methodology to repair the floors. Thereafter, Core was required to perform the changed work and Core submitted a PCO for same as soon as [Core] knew the cost" (Doc. 116-1, ¶ 15).  Core also "disputes Plaintiffs' assertion of "Date First Observed." (Doc. 115, at 14 n.26.)  However, Core does not offer any evidence to demonstrate written notice to Plaintiffs within 21 days of observing the condition, which it impliedly admits it did before constructing the mock up.  Core points to an email sent on January 16, 2018 as evidence that it notified Plaintiffs of the flooring issues "immediately" (Doc. 117 ¶ 41), but in the same email notes that it "ha[d] conducted a mock up area" and held "two previous meetings on site" where it "set out to establish a basis of preparation that will meet the industry standards" (Doc. 105-23, at 2).  It appears Plaintiffs had notice of this claim by virtue of their attendance at these meetings and their admission that "[c]oncerns about flooring challenges were brought up as early as September of 2017," "Core's suggestion to prepare a few mock up samples for review and opinion from the

[Plaintiffs] was not declined," and "[t]he location of the suggested mock up areas were collectively approved upon on December 13." (Doc. 105-23, at 14.) But even still, the Contracts are clear that *written* notice is required to initiate a claim, and Core has failed to provide any evidence that it submitted any written notice to Plaintiffs within the contractual 21-day period for this subject matter.

For these reasons, summary judgment is **GRANTED** on Core's counterclaim as it relates to PCOs 181019 and 761015-16 and **DENIED** on Core's counterclaim as it relates to PCOs 071010-14, 181010-18, 076010-14, and 076017-19.

## B. Claims for Time Extensions

Next, Plaintiffs move for summary judgment on Core's counterclaims relating to time extensions under PCOs 071014, 181017-19, and 761014-18. (Doc. 102, at 17-20.) Plaintiffs argue Core has waived its claims for extensions of time by failing to comply with two contractual requirements: first, Core failed to provide a fragnet analysis with its extension requests as required by § 4.3.7.1, and second, Core's extension requests failed to demonstrate that Core was not concurrently delaying the project, as required by § 8.3.4. The Contracts provide, in relevant part:

> If the Contractor wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. *The Contractor's Claim shall include a fragnet analysis utilizing the most current updated Construction Schedule, establishing the impact on the*

> *Project's critical path*. In the case of a continuing
> delay only one Claim is necessary. All claims for time
> extensions not meeting these requirements are waived.

(Contracts, at § 4.3.7.1) (emphasis added). The Contracts also
provide:

> Contractor's written claims for extension of Contract
> Time shall be accompanied by detailed dates,
> correspondence, notice, and any other data which
> provides proof of the events which are the basis for the
> claim, that details the critical path Work items on the
> schedule, justifying the time extension. Said request
> shall specifically detail the extension of the critical
> path of the Project caused by the events which underlie
> the time extension request. Any claim not including said
> data shall be deemed waived, until such time as
> contractor provides such data in accordance with the
> contract documents.

(Contracts, at § 8.3.4.) Core asserts its claims survive because

it submitted the required fragnet analyses within updated monthly

pay schedules given to Plaintiffs each month. (Doc. 115, at

18-19.)

The contract language is clear - Core was required to include

a fragnet analysis in any claim for an increase in contract time.

(Contracts, at § 4.3.7.1.) When asked whether Core ever submitted

fragnet analyses with its time extension requests, Mr. Hoffman,

Core's Senior Project Manager, responded that "they were shown on

the updates for the monthly pay applications." (Doc. 106-1,

211:6-10.) Plaintiffs reiterated: "The monthly update included a

fragnet; is that what you're saying?" to which Mr. Hoffman

responded, "Included in the impact." (Id. at 211:11-13.)  But Mr. Hoffman, when subsequently asked "Have you ever prepared [a fragnet analysis] on this job?" also responded "No."  (Id. at 210:23-211:2.)[4]

As stated above, when the nonmovant (Core) bears the burden of proof at trial – as it does here - the movant (Plaintiffs) has two options as to how it can carry its initial burden. Fitzpatrick, 2 F.3d at 1115-16.  Plaintiffs may demonstrate an absence of evidence to support Core's case, or provide affirmative evidence demonstrating Core's inability to prove its case at trial. Id.  Core must then respond according to the manner used by Plaintiffs.  When Plaintiffs demonstrate an absence of evidence, Core may either identify evidence in the record sufficient to withstand a directed verdict, or Core may come forward with additional evidence sufficient to withstand a directed verdict. Id. at 1116-17.  Here, Plaintiffs have shown an absence of evidence that Core provided the fragnet analyses required by the Contracts. As such, Core must either identify evidence sufficient to withstand a directed verdict or come forward with additional evidence sufficient to withstand the same.

---

[4] Mr. Hoffman also stated that Core was "never allowed the opportunity" to submit fragnet analyses. (Doc. 106-1, at 210:23-211:2.)  Core, however, points to no record evidence to substantiate this claim except as related to the waiver issue discussed below, and Core does not argue impossibility of performance.

Core has provided no such evidence. Although Mr. Hoffman makes conclusory allegations that fragnet analyses were provided via the monthly pay applications, Core does not actually provide any of those applications to the Court. Other than Mr. Hoffman's statement, there is no evidence in the record that Core ever provided a fragnet analysis as required under the Contracts. As courts in this circuit have held, "mere conclusory, uncorroborated allegations by a [non-movant] in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment." Hansen v. Perry Techs., 206 F. Supp. 2d 1223, 1225 (S.D. Fla. 2002) (citing Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990)). Without evidence of the fragnet analyses, Core has waived its claims for extensions of time as a matter of law. Thus, the only question remaining for the Court is whether, as Core argues, Plaintiffs waived their right to *receive* those analyses.

In Georgia, although "[w]aiver is a jury issue if there is conflicting evidence," in cases "where . . . the facts and circumstances essential to the waiver issue are clearly established, waiver becomes a question of law." Pulmonary Assocs. of Charleston PLLC v. Greenway Health, LLC, No. 3:19-cv-167, 2020 WL 9073551, at *6 (N.D. Ga. June 29, 2020) (internal quotations and citations omitted). "The law will not infer the waiver of an important contract right unless the waiver is clear and

unmistakable.   And the burden of proof lies with the party asserting waiver."   Id. (citations and quotations omitted.)

Core's waiver argument centers on its assertion that Plaintiffs accepted its "updated schedules supporting each monthly application for payment, all of which, except for the last Pay Application, were paid." (Doc. 115, at 18.)   Core earlier argued that these monthly schedules included the required fragnet analyses.  (Id. at 17.)   Now, it argues that "even if Core did not provide a [fragnet analysis], Core did provide [the updated monthly schedules]," Plaintiffs' acceptance of which amounted to waiver of Plaintiffs' right to receive those analyses in Core's requests for extension of contract time.  (Id.)

This argument is misguided.  While Plaintiffs do not dispute they accepted Core's updated monthly schedules and paid Core accordingly, Core provides no evidence those schedules included the claims for time extension at issue here – much less the required fragnet analyses.  The pay schedules' alleged failure to include unapproved claims for time extensions aligns with the Contracts, which state that "[t]he updated construction schedule [submitted with each monthly pay application] shall incorporate into it all extensions and reductions of the contract time *which have previously been approved by duly executed change orders*." (Contracts, at § 3.10.2) (emphasis added).   There is no dispute that the extension requests at issue here are found in *unapproved,*

*unexecuted* change orders, which Core argues Plaintiffs should have approved and executed.   Whether Plaintiffs continued to pay Core under the regular contract schedule does not bear on whether Plaintiffs accepted or rejected Core's claims for extensions of contract time, and Core does not point to any evidence showing that Plaintiffs abandoned their right to receive fragnet analyses, even though it was Core's burden to provide evidence that would make waiver a jury question.

Accordingly, there is no genuine dispute of material fact that Core failed to provide fragnet analyses with its extension requests; no genuine dispute of material fact that Core was required to submit those analyses under § 4.3.7.1; and no genuine dispute of material fact that Plaintiffs' actions failed to constitute waiver of its right to receive fragnet analyses.   Thus, Core's counterclaims for extensions of time are waived under the Contracts as a matter of law, and summary judgment on those claims is **GRANTED**.[5]

### C. Claims for Delay Damages

Third, Plaintiffs move for summary judgment on Core's counterclaim for $364,000 in delay damages, which is most clearly

---

[5] As noted above, Plaintiffs also argue that Core's claims for time extensions are waived because "Core failed to provide, as required by the contract, proof that it was not concurrently delaying the project." (Doc. 102, at 19.)  Because the Court has already found that Core waived its claims for extensions of time by failing to provide accompanying fragnet analyses, the Court does not address this argument.

outlined in Core's Rule 26(a)(1) disclosures.  (Doc. 102-5, at 9.)
While it is not entirely clear which provisions encapsulate Core's
claim for these delay damages, it seems to arise from the
allegations that Plaintiffs breached the implied covenant of good
faith and fair dealing by, in relevant part, "[f]ail[ing] to
execute appropriate Change Orders for scope changes and additional
contract time pursuant to Article 7 of [the Contracts]," and
"[u]nreasonably withheld additional time from valid Change Orders
in contravention of Article 8.3.1 of [the Contracts]."  (Doc. 7,
¶ 67(i)-(j).)  Article 8.3.1 provides the following:

> *If the Contractor is delayed at any time in the progress*
> *of the Work due to causes outside of its control or the*
> *control of its subcontractors or suppliers, the*
> *Contractor may submit a Change Order requesting an*
> *extension of the Contract Time in accordance with the*
> *procedures established in Article 7 and 4.3.7.* The
> Contractor warrants by execution of the Contract that
> the Contractor has accounted for and anticipated
> foreseeable delays and that the Work can be completed
> within the Contract Time. The Owner shall not
> unreasonably withhold approval of a Change Order
> requesting additional time due to delay when (a) the
> delay was unforeseeable at the time of the execution of
> the Contract, (b) the delay was not caused by the
> Contractor or its subcontractors or suppliers, and (c)
> the delay could not have been avoided by the Contractor's
> timely notice to the Owner and (d) the Contractor was
> not concurrently delaying the project's critical path at
> the time the delay which is subject of the proposed
> Change Order occurred. Any extension of the Contract
> Time shall be net of any foreseeable delays or other
> delays attributable to the Contractor.

(Contracts, at § 8.3.1) (emphasis added).  Article 7 defines the process of executing work under CCDs and also defines change orders, for which the claim process is outlined in § 4.3.  (Id. § 4.3.)  The Parties, however, do not agree about whether this claim for delay damages arises under the former or latter provision.  Predictably, Plaintiffs argue that Core's claim is barred under either provision, while Core argues it survives under both.

As the Court discussed in Section A, *supra*, Core provided adequate notice for many of its claims for additional contract *sums* to survive summary judgment.  However, as the Court found in Section B, *supra*, Core's claims for additional contract *time* under § 4.3.7.1 are waived due to Core's failure to provide fragnet analyses.  Accordingly, to the extent Core's delay damages claim arises from Plaintiffs' alleged failures to accept Core's claims for extensions of contract time under § 4.3, summary judgment is appropriate.

Having found summary judgment appropriate on Core's counterclaim for delay damages under § 4.3, the Court must turn to the propriety of summary judgment on Core's counterclaim for delay damages under the alternate provision - § 7.  Section 7 defines a CCD as "a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract

Time, or both." (Contracts, at § 7.3.1.) Essentially, a CCD instructs the Contractor to complete a specific project, implying the Parties will determine the appropriate payment amounts and time extensions upon completion. CCDs are "prepared by the Architect and signed by the Owner and Architect." (Id.) "Upon receipt of a [CCD], the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the [CCD] for determining the proposed adjustment in the Contract Sum or Contract Time." (Id. § 7.3.4.) "If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the method and the adjustment shall be determined by the Architect on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in the case of an increase in the Contract Sum, a reasonable allowance for overhead and profit." (Id. § 7.3.6.)

Plaintiffs argue that § 7.3.6 "is inapplicable to the issue of time extensions." (Doc. 120, at 22.) According to Plaintiffs, "Section 7.3.6 relates to determination by the Architect relating to the Contract Sum, *not* Contract Time. There is no reciprocal provision for Contract Time." (Id. at 23) (emphasis in original). But when considered in the context of the Contracts, § 7.3.6 *does* apply to contract time. First, § 7.3.4 requires the Contractor

31

"advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the [CCD] for determining the proposed adjustment in the Contract Sum or Contract Time." Then, § 7.3.5 indicates that if the Contractor signs the CCD, the Contractor agrees therewith – including with adjustments in the contract sum and contract time or the method for determining the same. Finally, § 7.3.6 provides that "the method and the adjustment shall be determined by the Architect" in either of two circumstances: (1) "[i]f the Contractor does not respond [to the CCD] promptly," or (2) if the Contractor "disagrees with the method for adjustment in the Contract Sum." While the latter circumstance only applies to disagreements with the method for adjustment in the contract sum, the former – the Contractor's failure to respond – is not so limited. And while the Contract does not address how to proceed in a third, unmentioned circumstance – an active disagreement over the contract time – such a circumstance is not presently before the Court, because it is undisputed that Core failed to promptly respond or object to the CCD's failure to extend the contract time. (Doc. 115, at 20-22; Doc. 120, at 23.) That failure raises an obligation of the Architect to determine the method and the adjustment in contract time "on the basis of reasonable expenditures and savings of those performing the work attributable to the change." (Contracts, at § 7.3.6.) And neither party disputes the Architect did not determine such method or

adjustment of contract time, even while the Architect did testify that Core "did the work," "submitted for payment," and "should have been paid." (Doc. 116-2, at 144:23-147:14.)

Accordingly, while Core has waived its claims for time extensions under the PCOs due to its failure to provide fragnet analyses, it may still have a claim under the Contract, or under the Implied Covenant of Good Faith and Fair Dealing, for delay damages under § 7. Therefore, summary judgment with regard to Core's counterclaim for delay damages under § 7 is **DENIED.**

### D. Claims for Unjust Enrichment

Finally, Plaintiffs move for summary judgment on Core's alternative claims for unjust enrichment. As the Court noted in its December 10, 2019 Order, "Counts III and IV of Defendant's counterclaim are carefully pleaded to state claims for unjust enrichment, and specifically seek compensation for work performed by Defendant pursuant to change orders outside the scope of the express contracts." (Doc. 60, at 5.) Plaintiffs assert that "[d]ue to the evidence adduced through the progression of this litigation establishing that valid and enforceable contracts exist and that Core's unjust enrichment claim is identical to its breach of contract claim, summary judgment is now proper on Core's unjust enrichment claims." (Doc. 102, at 25.) The Court agrees.

"While a party may plead equitable claims in the alternative, the party may only do so if one or more of the parties contests

33

the existence of an express contract governing the subject matter of the dispute." Terrill v. Electrolux Home Prods., Inc., 753 F. Supp. 2d 1272, 1291 (S.D. Ga. 2010) (quoting Goldstein v. The Home Depot, U.S.A., Inc., 609 F. Supp. 2d 1340, 1347 (N.D. Ga. 2009)). A party may likewise plead an equitable theory if it alleges that the beneficiary received a benefit outside the scope of an express contract. See Ballard Marine Constr., Inc. v. CDM Constructors, Inc., CV 417-118, 2018 WL 3090393, at *3 (S.D. Ga. Feb. 7, 2018) (finding that a plaintiff states a cause of action for unjust enrichment when it alleges the defendant received a benefit outside the scope of an acknowledged contract). Moreover, courts have found that when a claim for equitable relief reincorporates an allegation that a contract exists, the acknowledgment of the contract causes the equitable claim to fail because in such cases there is no dispute as to the existence of a contract. See Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C., 426 F. Supp. 2d 1356, 1372 (N.D. Ga. 2006) ("[One] cannot claim within a single count that there was an agreement and that the [defendant] was unjustly enriched."); Goldstein, 609 F. Supp. 2d at 1347 (dismissing equitable claim when plaintiff incorporated into equitable claim allegations that plaintiff and defendant had entered into contract); Gilbert v. Powell, 301 S.E.2d 683, 686 (Ga. Ct. App. 1983) (upholding trial court's decision to strike claim for equitable relief when that claim acknowledged an express contract).

Here, Core properly pled its unjust enrichment claims in the alternative to its breach of contract claims. (Doc. 7, at ¶¶ 49-63.) At the pleading stage, Counts III and IV existed outside the terms of the written contracts at issue here because, as the Court previously noted, "Counts III and IV [did] not reference any contract between Plaintiffs and Defendant." (Doc. 60, at 5.) However, the record now indicates there is no genuine question of material fact that the Contracts governing Core's counterclaims for breach of contract also govern whether Core may recover for the PCOs under an unjust enrichment theory. While those counterclaims allege that "Core was hired by FP to perform certain construction work on Buildings[] #7, #18, [and] #76" without referencing the Contracts at issue (Doc. 7, at ¶¶ 50, 57), Core's corporate representative has admitted there was no other agreement or contract under which the work was performed (Doc. 104-1, at 85:17-86:6). Accordingly, the only question for the jury on these PCOs is whether Plaintiffs wrongfully rejected them on the basis of Core's alleged waiver; *not* whether the work itself fell outside the scope of the Contracts. Indeed, if the jury finds the work did fall outside the Contracts, it would only be so because of Core's failure to comply with the same – not because the Contracts' scope did not incorporate the subject matter of these PCOs.

Core cites to <u>Pro Metal Bldg. Sys., Inc. v. T.E. Driskell Grading Co.</u>, 316 S.E.2d 574 (Ga. Ct. App. 1984), to argue that Core is entitled to recovery under an unjust enrichment theory where extra work was performed outside the terms of the Contracts. However, that case is distinguishable. There, the Court found a material ambiguity in the contract about whether the additional work was included in the scope of the original contract. <u>Id.</u> at 127-129. Here, however, Core argues that Plaintiffs failed to "execute *valid* change orders" under the existing contract. (Doc. 115, at 25) (emphasis added). As Core now argues, these claims arise from "Plaintiffs' failure to properly administer the Contracts." (<u>Id.</u>) It follows Core's arguments, then, that had Plaintiffs properly administered the Contracts, Core would have no claim for unjust enrichment because Plaintiffs would have compensated it for the contested work. The benefits conferred on Plaintiffs here are only extra-contractual because Core allegedly waived its rights *under the Contracts* by failing to timely notify Plaintiffs of its claims. "If [Defendant] [is] unable to recover on [its breach of contract] claims, it will be because [it] [is] not entitled to recover under the written contracts . . . . [Defendant] will not lose [its] [breach of contract] claims because the [Contracts] are not valid or do not exist as a matter of fact." <u>Terrill</u>, 753 F. Supp. 2d at 1291. Accordingly, Core must proceed

under its breach of contract theory, and summary judgment on Defendant's counterclaims for unjust enrichment is **GRANTED**.

## IV. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that Plaintiffs' motion for partial summary judgment (Doc. 102) is **GRANTED IN PART and DENIED IN PART**. Summary judgment on Core's counterclaims under PCOs 181019, 761015, and 761016 is **GRANTED**. Summary judgment on Core's counterclaims *for time extensions* under PCOs 071014, 181017-19, and 761014-18 is **GRANTED**. Summary judgment on the remainder of Core's counterclaims under the PCOs, except as otherwise granted by this Order, is **DENIED**. Summary judgment on Core's claims for delay damages is **DENIED**. Summary judgment on Core's counterclaims for unjust enrichment is **GRANTED**. The case will proceed to trial in due course.

**ORDER ENTERED** at Augusta, Georgia, this __16th__ day of February, 2022.

_____

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA